Good morning, I'm Judge Gould. I'm presiding today, and happy to be sitting with my colleagues, Judge Graber sitting on my right, and Judge Pius sitting on my left. By the way, those designations have nothing to do with politics. We're just going to follow the law. But we've got three cases being argued, and a couple of others submitted on briefs. I'll mention for the record the submitted cases. We have Garcia-Vazquez case number 2193 that's submitted on briefs. We have Andrews v. Kijakazi, 22-355-29 that's also submitted on the briefs. And later today we have, later on the calendar, we have PSC Custom, LLC v. Hanover, insurance that's submitted on briefs. Let's go back. First case that will be argued today is Glanden v. Kijakazi, and this case is set for ten minutes per side. So if the appellant would like to do a rebuttal argument, please try to stop arguing before all your time's gone and reserve some time. However, I'm sort of a softy on these things, and given that we've only got three arguments, if you use up your time, I'll probably give you a minute for a rebuttal. But it's best to stay within the time. Let's proceed with the appellant's argument. Thank you, Your Honor. May it please the court, I am Chad Hatfield, representative for Mr. Glanden. In this case, it's important to recognize the date last insured of June 30, 2018. This was a Step 2 denial. The AL Administrative Law Judge did find sufficient medical evidence to establish medically determinable impairments, and that these would reasonably could produce the symptoms alleged by Mr. Glanden, but found that they were non-severe. And so what this case is about is about the Step 2, which is if it's severe or non-severe impairment, which is a de minimis standard screening tool to screen out cases that there's not more than a minimal effect on the ability to perform work activities. Counsel, what specific relief do you seek? Because obviously at this point, there can no longer be contemporaneous medical records because they don't exist. So what specifically is the relief that you think that we can or should grant? Yes, it would be a remand for additional proceedings to continue past the Step 2 and complete the sequential evaluation. Consider giving weight to the claimant's testimonies and the lay witness testimony of the frequency of some various symptoms during that time period when due to lack of medical insurance, there was no contemporaneous records. So, Counsel, if we agree with you that it was an error to decide the case on Step 2, wouldn't we just vacate the judgment and remand for further proceedings on the other steps? Yes, Your Honor. As it came to, we heard the medical expert, Dr. Smiley. He said he had no question that there was impairment, significant limitations, yet he couldn't give the frequency and go further in a sequential evaluation without the claimant testimony. And so it would be necessary to evaluate the claimant testimony and to provide a vocational expert based upon the credible testimony provided by the claimant. There is some evidence that the back issues, at least, became considerably worse after the end of the period when there was a sudden pain after doing yard work. Is that, in your view, insufficient? For example, I believe there was a statement that your client made that his symptoms got worse over the two months before July of 2019. Apart from the issue of insurance, why isn't that substantial evidence to support what the ALJ did? Okay, Your Honor. I'm getting answers to this question, but backtracking just a bit, I think it's important to find the judges. Finding at Step 1, he found that the January 2018, when Mr. Glennon attempted to return to work, was an unsuccessful work attempt. Mr. Glennon had testified he tried to return to work, but had to take breaks to lie down from the sitting, the standing, and lying down for headaches during the day. The judge found that an unsuccessful work attempt, which by definition means that the work ended due to a medical impairment. Mr. Glennon testified that he had to lie down, he didn't have medical treatment during that time period, and needed to lie down to alleviate his symptoms, which the judge is required to consider under 16-3P. Now, an acute flare, he testified, came to the point he was in the emergency room and he was screaming at times from the plane with just standing there doing this. So, obviously, this is an acute flare, but the baseline of what he testified to was the need to lie down to alleviate his back pains and lie down for headaches, which would still be what I would consider to be a disabling level of impairment. And to this, the ALJ asked, well, couldn't the back, you know, this yard work, this bellow back injury, and the motor vehicle accident have caused these new herniations? And the medical expert unequivocally stated no. He said that sometimes people link these types of injuries to a specific traumatic event, but that's not really the case. He said the pathology, by looking at the imaging studies, would show that this was ongoing. And we do see on the surgical note as well that they stated that since the 2010 surgery that he continued to have back pain with numbness and symptoms down the right leg, which had recently become exacerbated. So, the fact that he was having pain at that time where it was kind of screaming and that level of intensity was an acute flare, but according to the testimony of Dr. Smiley, there was a, as he said, significant residual effect prior to that. And that would be consistent with the testimony that Mr. Glannon provided about what he was doing to alleviate his symptoms during the relevant time period. And so, what we see here is obviously the Ninth Circuit has a very strong, firm position that a claimant should not be penalized for the inability to afford treatment. In this situation, the net effect of the administrative law judge was to do just that. The medical expert testified that there must have been, he said he just couldn't imagine that there was not significant symptomatology during this time period. He thought there was missing records. He was not aware that there was just a lack of insurance during that time period. Mr. Glannon fully explained that the efforts he made was denied insurance, incarcerated for part of the time, denied in other states, got in, finally got insurance, got an appointment, which took several months, and got into the hospital. He found that to be an unsuccessful work attempt, that the work attempt did end due to a medical condition, knew he was having symptomatology, had in his findings, and the reason for discounting all the statements was that there was no objective evidence during that time period. The lay witness statement that was also provided, noting the symptomatology during that time period without records, the administrative law judge rejected because there was no, not to be inconsistent with medical records, but because there was a lack of medical records during the time period. With respect to the lay witness issue, did you raise that before the district court? It appeared not. I believe we did, as we talked about 18-1P, which is kind of analogous to 16-3P, that you can consider other evidence. That is defined as statements from the claimant or from other sources. And so it's, the ALJ has a duty to consider both the claimant statements. No, I'm asking a different question. I'm asking whether you waived or forfeited this issue on appeal by not raising it specifically to the district court. The lay witness question. I don't know that it was in a sub-category on its own, Your legal principle is that the ALJ neglected to consider the other statements made. And that's one of the enumerated statement examples in the Social Security rulings is the evidence made by lay witness. Well, I gather if you were to prevail here when it got back to the ALJ, you could raise that issue again. That is the lay witness. Yes. And that was presented to the ALJ. Yeah. Counsel, did you want to reserve any time for rebuttal? Yes, Your Honor. Thank you. Good morning. I'm Shada Stuckey, appearing on behalf of the Commissioner of the Social Security Administration. We asked the court to affirm the district court's order that upheld the ALJ's decision. The Social Security Act states that an individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence of a disability. The district court's order states that an individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence of a disability. The district court's order states that an individual shall not be considered to be under a disability unless he Now, the ALJ did not just rely on a lack of evidence in this case. The ALJ cited evidence that Mr. Glandon's significant headaches, back pain, and balance problems subsided by early 2017 or much earlier and did not begin again until after the relevant period ended in June 2018. Mr. Glandon reported to He made a similar statement the next month, in July 2019, that his symptoms got worse over the past two months. And a year after that, in September 2020, Mr. Glandon reported that his disabling headaches, back pain, and balance problems began after his car accident in July 2019, over a year after the period at issue ended. The ALJ also noted that medical records from December 2020 identified chronic traumatic encephalopathy or CTE associated with head trauma as a new problem for Mr. Glandon. And again, that was December 2020. The ALJ also found that Mr. Glandon's alleged brain traumas and headaches did not appear as significant complaints from 2013 through 2017. So, in the several years before the relevant period, we can see that Mr. Glandon, he did report headaches after a prison injury in December 2015 and January 2016. But this was short-lived. We then see reports from April 2016 that Mr. Glandon had no complaints and no signs of trauma. That's at CAR 2132. We see the same thing in December 2016. No complaints, no signs of trauma. That's at CAR 2148. And then in December 2016, medical providers again report that Mr. Glandon has no complaints and no signs of trauma. That's at CAR 2163-64-2166. And finally, we see the same thing in January 2017. No complaints, no signs of trauma. That's at CAR 2167-2168. Then, Mr. Glandon leaves prison in January 2017 and there are no medical records for a two and a half year period that covers the period at issue. What do we do with the fact that we know that he didn't have insurance and financial resources during that period of time? The ALJ suggested that he could have sought some sort of care at local free clinics or go to the emergency room. Right, and we know that the record showed that Mr. Glandon knew about free clinics and emergency treatment that was available to him despite his lack of insurance. Before 2017, Mr. Glandon went to the emergency room. But he testified, as I recall, that they were just sort of standard clinics where he could go in and get shots, you could get a quick exam. But what he was looking for, what he needed was regular care and he testified that he couldn't get that kind of care at the free clinics. Right, but I think it's really important to note that Mr. Glandon, he testified that he regained insurance in January 2019. But then he waited, even after that, he waited five months to get care. He said that he was looking for a personal doctor, but eventually he went to the emergency room when he couldn't take it anymore. And that didn't happen until June 2019, a full year after the period issue ended. Records show that he went to the emergency room for care on June 4, 2019. That's at car 451. It says seen in ED on 6-4-2019. So even when he finally gets insurance, six months after the relevant period ends, he then waits five more months before finally going to the emergency room. When I read his testimony, he sort of offers, he explains that he had to first get, he had to enroll in the Medicare, not Medicare, Medicaid program here in Washington. And it took some time. And then he had to get his card and then he had to find a doctor and then he had to schedule an appointment. And that took, and he testified, that took a while. It took a while, but where does he go when he finally, he goes to the emergency room to get care? He's got insurance at that point. What? He's got insurance at that point. Yeah, he had insurance five months before that. He could have gone to the emergency room in January of, what was it, January of 2019, but he waits. Because again, he's not experiencing these severe symptoms until finally in June he has this yard work problem. How do you respond to Dr. Smiley's testimony regarding his back? Dr. Smiley basically testified that he finds it difficult to accept the notion that he would not have been symptomatic during the relevant period. Right, right. And the ALJ did acknowledge that. Dr. Smiley found it hard to believe that Mr. Glandon was asymptomatic. But it's important to note, Dr. Smiley repeatedly insisted that the record was incomplete. At CAR 198, he says, in disbelief, he didn't just not see anybody at all. So Dr. Smiley, you know, he just could not accept that Mr. Glandon went two and a half years without seeking treatment. But in fact, the record was complete for that period. Mr. Glandon essentially concedes that he did not seek treatment for those two and a half years. So contrary to Dr. Smiley's speculation, there are no medical records to collect. Mr. Glandon really did not see anybody at all. And when the ALJ focused Dr. Smiley on the actual record in front of him, which we do know was the complete record for the period at issue, then Dr. Smiley testified that, in fact, no limitations could be assessed. There was no evidence of brain trauma during the period at issue. And if Mr. Glandon reported in June 2019 that he had just had this recent flare-up, and the records do show that, they show that he said that, then Mr. Glandon wasn't all that symptomatic, in the words of Dr. Smiley. Counsel, it also appeared to me, and I may be mistaken about this, but it appeared to me that Dr. Smiley was distinguishing between underlying pathology and symptoms. That is, you know, millions of people have horrible looking MRIs about their back, and they may have some symptoms, but the symptoms either can wax and wane or whatever. And so in this context, I didn't see him say that there was significant limitation as distinct from significant pathology. Am I missing something? No, that's right. You know, pathology is different than symptoms and limitations. And Dr. Smiley was troubled by the pathology that showed Mr. Glandon's back. You know, it didn't look normal. It wasn't a normal back. There were lots of irregularities in the imaging. But for an impairment to be severe, Mr. Glandon needed to show symptoms, and more specifically, limitations during the relevant period. And the record does not show that here. Judge Gould, I don't want to interrupt your argument, but I have a concern and a question. My question is, was the residual functional capacity of Glandon, was that ever assessed by the ALJ? No, the residual functional capacity was never assessed by the ALJ. I mean, the position is that there were no limitations during the relevant period. So only step two was reached, and the residual functional capacity is developed after step two in the sequential analysis. That's basically my concern. In other cases where I've reviewed Social Security issues, there have been lots of cases saying that step two is only a de minimis device to exclude frivolous claims. And it seems to me the panel could better assess whether Glandon could work if there had been an RFC determination. I might be wrong in that, but what's your response to that? I apologize. I was not picking up the full question there. It was kind of coming in and out. It sounds like there's a concern that it is a de minimis standard at step two. And we agree that it is a very low standard at step two, and usually that is passed in these cases. This is an unusual case. We don't have any records from the period at issue or the period surrounding one year on either side. And we also have evidence from before that and after that suggesting that there were no symptoms. There may have been symptoms, but I think you can have symptoms without reaching the level needed for step two. It's not enough to have some symptoms. Right. Basic work activities is, I think, the standard. I see that I'm over my time. If there are no further questions, we submit that Mr. Glandon did not meet his burden. He did not furnish medical or other evidence establishing the existence of a disability as required by the Social Security Act. Substantial evidence supports the ALJ's decision, and we ask the court to affirm. Thank you, counsel. Thank you. Just real quickly, a few items. Lots of those records in the prison system are kind of out of context. It's asked if there's trauma in a prison system. If you're having trauma, you can go into an isolated or get some kind of mental health separation. That's not what this was about or what Mr. Glandon is applying for disability, not regarding his back. The difference is seeking emergency room treatment for emergencies when he was screaming in pain versus what he testified to, the need to lie down during the workday when he's having back pain. He testified he did occasionally try yard work without needing to go lie down afterwards during the day. So this is a matter of what could he sustain a competitive workforce. The judge found in us as a work attempt ended due to him having to take breaks to lie down due to back pain and his headaches. So that is more than just a minor symptom. He actually lost a job, and we know that's inconsistent with competitive employment. It does say that it got worse upon that exacerbation. It doesn't say it just started. Dr. Smiley was concerned about pathology, stating that the symptoms could not have just started. It did not get a new herniation. He said that based on pathology of the records, he found it hardly was asymptomatic. He knew there were symptoms. His only concern was he didn't have. Counsel, thank you, but I'm afraid your time is up. Thank you for your attention. Should conclude unless Judge Graper or Judge Paz has a further question. Okay, then. I want to thank both counsel for their spirited and excellent arguments. And Klan versus Kijikazi shall now be submitted, and parties will hear from us in due course.
judges: GRABER, GOULD, PAEZ